IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL, et al., | CV 20-19-BLG-SPW-TJC |
| Plaintiffs, | |
| vs. | **FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |
| JOHN MEHLHOFF, State Director, the BUREAU OF LAND MANAGEMENT, et al., | |
| Defendants. | |

Plaintiffs filed this action seeking declaratory and injunctive relief against

Defendants' implementation of vegetation and riparian treatments in the Iron Mask

Planning Area ("Iron Mask").  (Doc. 1.)  Before the Court is Plaintiffs' Motion for

Preliminary Injunction.  (Doc. 5.)  Defendants have filed a response and Plaintiffs

replied.  (Docs. 7 & 10.)  The matter is fully briefed and for the following reasons,

the Court recommends the motion be GRANTED.

## I.    Factual Background

The facts underlying the present action are not in dispute.  The Iron Mask

comprises 124,933 acres in the Upper Missouri Watershed Basin near Townsend,

Montana.  The BLM administers 26,235 acres within Iron Mask, consisting of 19

parcels, under the Butte Rangeland Management Plan ("RMP").  Portions of Iron

Mask are designated an Area of Critical Environmental Concern, for which special management of fish and wildlife and other resources is given.

On July 1, 2015, the BLM issued a Decision Record that contained a Finding of No Significant Impact for vegetation and riparian treatments within Iron Mask. All treatments fall within the Area of Critical Environmental Concern. Plaintiffs filed suit alleging, among other things, that BLM failed to address the cumulative impacts to fish and wildlife within Iron Mask and the Area of Critical Environmental Concern. This Court ruled in *Native Ecosystems Council v. Judice*, 2019 WL 1131231 (D. Mont. 2019) ("*Iron Mask I*") that BLM had failed to perform a cumulative impacts analysis of past, present, and reasonably foreseeable vegetation projects in the 2015 Iron Mask Environmental Assessment ("EA"). *Iron Mask III*, 2019 WL 1131231 at *8. The Court ordered the EA remanded to the BLM to prepare a supplemental EA. *Id.* at *9.

BLM subsequently conducted and released the Iron Mask Supplemental EA (or "SEA") on September 20, 2019, and a Decision Record for Vegetative Treatments on September 23, 2019, authorizing prescribed burning and mechanical removal of conifers and sage brush. Collectively, the Iron Mask EA, SEA, and the 2019 Decision Record authorized treatments on 5,397 acres. Plaintiffs subsequently filed the present action alleging BLM failed to analyze the cumulative impacts of vegetation treatments on wildlife, especially BLM-listed

2

special status species, within Iron Mask and the Area of Critical Environmental Concern.  (Doc. 1.)

The most recent burn "window" opened in March 2020.  By April, BLM had completed 60 percent of the prescribed burning under the SEA Decision Record but suspended further treatments due to the current COVID-19 health crisis.  At the time of briefing, 3,558 acres remained to be treated mechanically and up to 417 acres burned.  Plaintiffs herein moves to enjoin future treatments.

## II.  Legal Standard

The United States Supreme Court has characterized injunctive relief as "an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008)). In *Winter*, the court reiterated the four-element standard a plaintiff must establish to obtain a preliminary junction: (1) likely to succeed on the merits; (2) likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in plaintiff's favor; and (4) an injunction is in the public interest.  *Id.* at 20.  The *Winter* Court rejected as too lenient the Ninth Circuit's "possibility standard" for irreparable injury, emphasizing that "likely" is the standard.  *Id.* at 22.

The court did not disturb the Ninth Circuit's use of a "sliding scale" approach, however, in which the elements are balanced.  *All. for the Wild Rockies*

3

*v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).  In *Cottrell*, the Ninth Circuit explained:

> Under this approach, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits.

*Id.*  Under the circuit court's approach, an injunction may be issued where a plaintiff raises serious questions going to the merits – instead of showing the likelihood of success – so long as the balance of hardships tips sharply in the plaintiff's favor as well, assuming the other two elements are met.  *Id.* at 1131-1132.

Defendants suggest in a footnote that the "serious question" test is no longer viable but advances no serious argument in support.  (Doc. 7 at 13, FN1.) Defendants argument is also contrary to the *Cottrell* decision, which discussed at length the survival of the sliding scale and flexible approach and thus the use of the "serious questions going to the merit" test.  The *Cottrell* Court cited Justice Ginsberg's dissent in *Winter*, who wrote that the "Court has never rejected that formulation, and I do not believe it does so today."  *Cottrell*, 632 F.3d at 1132 (quoting *Winter*, 555 U.S. at 392 (Ginsberg, J., dissent)).  The Ninth Circuit also looked to sister circuits, noting the Second Circuit's holding in *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35-38 (2d

4

Cir. 2010), which held: "We have found no command from the Supreme Court that would foreclose the application of our established 'serious questions' standard as a means of assessing a movant's likelihood of success on the merits." *Cottrell*, 632 F.3d at 1134 (accord with *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). The Ninth Circuit also noted other district courts grappling with the issue, concluding the "'serious questions' version of the sliding scale test for preliminary injunctions remains viable." *Cottrell*, 632 F.3d at 1134.

Nevertheless, as discussed below, the Court finds a preliminary injunction is appropriate regardless of whether the "likelihood of success" or the "serious question" test is applied.

## III. Discussion

Plaintiff asserts that a preliminary injunction is proper because it can satisfy all the *Winter* elements. (Doc. 6 at 11.) Defendants argue that Plaintiffs have failed to demonstrate them. (Doc. 7 at 7.) The Court will address each element and the parties' respective arguments in turn.

### A. Likelihood of Success on the Merits

Plaintiffs assert the first element is satisfied because serious questions on the merits have been raised. (Doc. 6 at 18.) Specifically, Plaintiffs argue BLM's SEA failed to analyze the cumulative impacts of vegetative treatments to sensitive

species in the Iron Mask, and in so doing violated NEPA and this Court's order in *Iron Mask I*.  (*Id.* at 19.)  Plaintiffs argue that by not providing detailed information on several BLM-listed sensitive species, the BLM did not take a "hard look."  (*Id.*)

Defendants argue that Plaintiffs cannot rely on the "serious question" standard because they fail to show the balance of hardships tips sharply in their favor.  (Doc. 7 at 23.)  Defendants thus assert that Plaintiffs must show they are likely to prevail on the merits and cannot do so because the SEA complies with NEPA.  (*Id.*)  Defendants further argue that the SEA sufficiently addresses cumulative impacts in addition to relying on tiering to portions of the 2015 EA and the Butte RMP/FEIS.  (*Id.* at 26.)

The Court in *Iron Mask I* found that the BLM failed to perform a cumulative impact analysis.  *Iron Mask I*, 2019 WL 1131231, at *8.  Absent from the EA was an analysis of "possible spill-over effects of the challenged decisions on the impacts to vegetation or wildlife inside the Planning Area."  *Id.*  The Court also noted that "the EA makes no attempt to analyze the cumulative impacts of the challenged actions when combined with 'reasonably foreseeable future actions' or past actions (such as other prescribed burns) outside the Planning Area."  *Id.*  The Court then remanded the matter to BLM "so that it may prepare a supplemental environmental assessment consistent with this order and the law."  *Id.* at *9.  In

accordance with the Court's order, the BLM set forth the scope of the SEA, in

pertinent part:

> The analysis needs to include the cumulative impacts of the challenged
> actions when combined with reasonably foreseeable future actions or
> past actions (such as other prescribed burns) outside the Iron Mask
> Planning Area.  The analysis needs to consider if and how prescribed
> burns outside the Iron Mask Planning Area impact vegetation and
> wildlife in light of prescribed burns that would occur inside the Iron
> Mask Planning Area.

(Doc. 6-3 at 10.)

The Court finds that Defendants failed to comply with the Court's mandate

in *Iron Mask* I and NEPA.  First, Defendants' reliance on tiering to prior

documents to satisfy the cumulative impact analysis is confounding.  The Butte

Proposed RMP/Final EIS expressly states that a major area where data was

incomplete or substantially lacking includes "[c]ertain wildlife inventory data (i.e.

lynx denning habitat, occupied pygmy rabbit habitat)" and "[w]ildlife monitoring

data."  (Doc. 6-7 at 3.)  BLM then concluded:

> As a result, *impacts cannot be quantified* given the proposed
> management of certain resources. Where this occurs, impacts are
> projected in qualitative terms, or in some instances, are described as
> unknown. *Subsequent project level analysis will provide the
> opportunity to collect and examine site-specific inventory data
> necessary to determine the appropriate application of the RMP level
> guidance*. In addition, ongoing inventory efforts within the Planning
> Area continue to update and refine the information used to implement
> this plan.  (Emphasis added.)

(*Id.*)  The subsequent 2015 Iron Mask EA failed to update and refine wildlife data in context of cumulative impacts; it is the precise document that the Court found deficient in *Iron Mask I*.  Thus, tiering the SEA back to the Butte RMP/FEIS and the 2015 EA, at least in context of cumulative impacts to wildlife, frustrates the very purpose of the Court's order in *Iron Mask I* to perfect the 2015 EA's deficiencies.

Second, the SEA does not remedy this deficiency.  Plaintiffs rightfully point out that the SEA only focuses on four big game species: elk, bighorn sheep, mule deer, and pronghorn antelope.  (*Id.* at 21.)  Indeed, Table 3.6.1 lists "all the known treatments in the cumulative effects boundary for *each relevant wildlife species* using treatment records, some going back to the 1960s."  (Emphasis added) (Doc. 6-3 at 48.)  The relevant species listed are elk, bighorn sheep, mule deer, and pronghorn antelope, omitting all other wildlife.  (*Id.* at 49-50.)  No similar analysis is conducted for other BLM-listed sensitive wildlife species that include the gray wolf, Brewer's sparrow, golden eagle, McCown's longspur, sage thrasher, Northern leopard frog, and westslope cutthroat trout.  (Docs. 6 at 21-22; *see* Doc. 6-1, Table 20 at 96-97.)

Defendants explain in a footnote that the occurrence of the species to which Plaintiffs call attention is minimal at best but offers zero data to support occurrence frequency by species, other than the 2015 EA's simple "documented in area" table.

(Doc. 7 at 30, FN3; *see* Doc. 6-1, Table 20, at 96-97.)  The footnote states: "simply because [the species] may be located in the Iron Mask Planning Area does not mean they would be affected by the proposed treatments which occur in only a small portion of the planning area, as described above."  (*Id.*)  Whether species that are in the Iron Mask would be affected by the proposed treatments is not just a serious question, it is *the* question when it comes to the stated scope of the SEA, the Court's order in *Iron Mask I*, and the mandate of NEPA.  Clearly, BLM has failed to address the question, lending to a likelihood that Plaintiffs would be successful on the merits.

Third, it appears from reviewing Defendants' citations to the SEA that no species save for the four big game species are "relevant," with little or no data in support, and no explicit justification regarding why more definitive information regarding the other sensitive status species could not be provided.  A single footnote in briefing does not suffice.  Defendants argue that "[t]he SEA addresses the effects to bird species, (which would include Brewer's sparrow, golden eagle, McCown's longspur, and sage thrasher) and found that because birds are highly mobile, any direct or indirect effects 'are expected to be rare.'"  (Doc. 7 at 30 (citing SEA 10-11 [Doc. 6-3 at 14-15]).)  But the SEA actually states:

> Because direct impacts are only slightly adverse during treatment with
> application of the timing restrictions on the use of prescribed fire, and
> the indirect impacts of habitat improvement attributable to the proposed
> action are only slightly beneficial on a broad scale, the impacts on bird

species have been considered and eliminated as an issue from the detailed analysis.

(Doc. 6-3 at 15.)  Thus, it appears from Defendants' logic that because direct impacts on sensitive bird species are only slight, they aren't relevant and were therefore eliminated from detailed analysis of cumulative impacts on bird species in the Iron Mask Planning Area.  This entirely misses the point of *Iron Mask I*'s command and NEPA requirements.

Under NEPA, "cumulative impact" is defined as:

the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  By Defendant's own admission, there is some "slight" impact of the proposed treatments on bird species.  (Doc. 6-3 at 15.)  It is the cumulative impacts of those individual impacts over time and space that the Court explicitly ordered Defendants to analyze for vegetation and wildlife.  Any attempt to use direct or indirect impacts in and of themselves as justification for not conducting the NEPA-mandated and Court-ordered cumulative impacts analysis misses the point.

Defendants further argue that sections 3.2 and 3.3 of the SEA provide "indirect and cumulative impacts associated with prairies and grassland bird

10

species." (Doc. 6-3 at 14-15.)  But in reviewing those sections, any reference to cumulative impacts on sensitive bird species are omitted.  Section 3.2 discusses the Butte RMP/FEIS's findings relating to vegetation conditions and conifer encroachment on grasslands that appear to justify the benefits – and some short-term effects – of prescribed burning.  (*Id.* at 29-34.)  Part and parcel to that justification are two mentions of cumulative impact and effects, each comprising one sentence, which proffer the total acreage of proposed conifer encroachment treatments by decade and the total acreage of grassland and shrubland vegetation restored per decade with treatments.  (*Id.* at 29.)  Wildlife is not mentioned.  A subsequent sub-section, 3.2.1, discusses effects on wildlife but is limited to material in the Butte RMP/FEIS, which, again, expressly states it does not have sufficient wildlife data.  (*Id.* at 32; Doc. 6-7 at 3.)  Section 3.3 thoughtfully discusses the effects of historic conifer encroachment, fire suppression, and vegetation treatments but lacks any meaningful discussion of cumulative impacts on sensitive wildlife species located within the Iron Mask Planning Area.  (*Id.* at 34-39.)

Plaintiffs also take issue with the SEA's lack of discussion of the Northern leopard frog and westslope cutthroat trout.  (Doc. 6 at 22.)  Neither party discusses the leopard frog in their briefs, but both parties address westslope cutthroat trout.  Plaintiffs cite to the Comment and Answer section of the SEA, in which BLM

11

responds to Plaintiffs' comment regarding westslope cutthroat trout habitat

protection considering the proposed treatments.  (Doc. 6-3 at 111, ¶ 58.)  BLM

responded: "[t]here are no westslope cutthroat trout streams in the vegetation

treatment areas at Iron Mask; it is not a relevant issue."  (*Id.*)  Plaintiffs then point

to the 2015 Iron Mask EA, which explicitly identifies westslope cutthroat trout

occurring in Beaver Creek, though BLM explains they have mostly been

hybridized with rainbow trout.  (Doc. 6-1 at 95-96.)  As it happens, the same

section identifies the northern leopard frog occurring on an "80-acre BLM parcel

with a small riparian area connected to Canyon Ferry Lake."  (*Id.* at 95.)  At the

least, Plaintiffs raise a serious question as to whether these species of amphibian

and trout are indeed in the treatment area.

Absent a justification regarding why more definitive information could not

be provided in the SEA itself, BLM must provide a detailed analysis of cumulative

effects of a proposed action.  *Friends of Wild Swan v. Kehr*, 321 F. Supp. 3d 1179,

1189-1190 (D. Mont. 2018), *aff'd sub nom.*, 770 F. App'x 351 (9th Cir. 2019); *Ctr.*

*for Envtl. Law and Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1007 (9th

Cir. 2011) ("General statements about 'possible effects' and 'some risk' do not

constitute a hard look absent a justification regarding why more definitive

information could not be provided."); *Klamath-Siskiyou Wildlands Ctr. v. Bureau*

*of Land Mgmt.*, 387 F.3d 989, 993-994 (9th Cir. 2004).  Here, Defendants have

12

failed to offer any justification in the SEA why it could not provide definitive information relating to the cumulative impact of the treatments on wildlife in the Iron Mask, especially those species for which the BLM took special effort to designate "sensitive."  More explanation, analysis, and definitive information is needed to demonstrate BLM gave all sensitive species in the Iron Mask Planning Area and the Area of Critical Environmental Concern a hard look.

Therefore, the Court finds that Plaintiffs have demonstrate a likelihood of success on the merits of their NEPA claim and satisfy the first element for a preliminary junction.

### B.     Likely to Suffer Irreparable Harm

Plaintiffs assert that they have demonstrated the challenged activities will imminently and irreparably harm their members and wildlife in the treatment areas. (Doc. 6. at 14-15.)  In support, Plaintiffs proffer the declaration of Michael Garrity, executive director of Alliance for the Wild Rockies and member of Native Ecosystem Council.  (*Id.*; Doc. 6-8.)  Garrity attests that he and members of the plaintiff organizations use and enjoy the areas in Iron Mask Treatment Unit 2, where treatment is planned for August 2020.  (Doc. 6-8 at ¶ 6.)  Garrity further avers that the treatments will irreparably harm his and other members' interests in the naturally functioning ecosystems of the Iron Mask and prevent their use and

13

enjoyment of the area in its undisturbed state.  (*Id.* at ¶  8.)  If the treatments are

continued, Garrity states:

> I will no longer be able to use this area for aesthetic, recreational,
> scientific, spiritual, vocational and educational activities or to view the
> wildlife species associated with juniper and conifer ecotones because
> the treatment will remove the habitat these species inhabit and the
> habitat that I enjoy visiting in the Iron Mask Planning Area.

(*Id.* at ¶ 11.)  Garrity also states that if prescribed burning and mechanical

treatments continue, the area will be irreversibly degraded, cannot be un-logged or

un-burned, and the wildlife that uses the destroyed habitat will be gone.  (*Id.* at ¶¶

13-16.)

　　　　Defendants argue that Plaintiffs' have failed to demonstrate likely

irreparable harm absent an injunction because the alleged harms are too

generalized; Plaintiffs failed to show how the treatments irreversibly degrade the

area; Plaintiffs have failed to allege harms to wildlife; and Plaintiffs delayed

seeking injunctive relief.  (Doc. 7 at 13-20.)

　　　　While the Ninth Circuit has "declined to adopt a rule that *any* potential

environmental injury *automatically* merits an injunction, it has also recognized

"[e]nvironmental injury, by its nature, can seldom be adequately remedied by

money damages and is often permanent or at least of long duration, i.e.,

irreparable."  *The Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008)

(quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545, (1987)); see also

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014).  Nevertheless, alleged harms "must be anchored in a specific and detailed allegation of harm to a particular species or critical habitat."  *All. for the Wild Rockies v. Kruger*, 35 F. Supp. 3d 1259, 1269 (D. Mont. 2014);  *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100, 1111 (E.D. Cal. 2013) ("To show such an injury, a plaintiff must identify specifically planned tree-cutting, link the proposed tree-cutting to its members' specific interests, and demonstrate how the proposed tree-cutting will harm those interests.")

Here, Plaintiffs have shown a nexus exists between the proposed prescribed burns and mechanical treatments in a specified area (remaining acreage to be burned in Iron Mask Treatment Unit 2), and the destruction of specific wildlife habitat in that area (conifer and juniper ecotones, shrublands and grasslands); with the members' specific interests (esthetic, recreational, scientific, spiritual, vocational, and educational) in seeing specifically BLM-listed sensitive species (elk, bighorn sheep, mule deer, pronghorn antelope, grey wolves, Brewer's sparrow, golden eagle, McCown's longspur, sage thrasher, Northern leopard frog, and westslope cutthroat trout) in an undisturbed state.  (Docs. 6-8; 10-1.)  The Court finds these allegations sufficiently constitute an actual and irreparable injury contemplated by NEPA.

Additionally, Defendants' argument that Plaintiffs delayed seeking injunctive relief does not alter this finding.  Plaintiffs' timeline of the handling of their case shows relatively quick action to correspond to BLM's expedient burning. (Doc. 10-3.)  Further, the sampling of authorities on which Defendants rely is unconvincing in comparison to Plaintiffs' timeline: waiting "months to seek an injunction" in *Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015), a copyright infringement case ("she did not seek emergency relief when the film first surfaced on the internet."); a "long delay before seeking a preliminary injunction" in *Oakland Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985), an anti-trust case (long delay "implies a lack of urgency and irreparable harm."); and a five-year delay "before taking any action" in *Lydo Enterprises, Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984), a constitutional challenge to a zoning ordinance restricting locations of sexually-oriented business (despite ordinance enacted in 1978 and notice of relocation in November 1982, "they took no steps until ten days before the deadline.").  (Doc. 7 at 19-20.)  In *Winter*, the activity alleged to be causing harm, sonar testing, had been going on for forty years.  *Winter*, 555 U.S. at 23.

Thus, the Court finds no merit in Defendants' attack on Plaintiffs' 33-day action period between notice and filing, particularly for a party with limited resources and a one-person, non-legal staff.  (*See* Doc. 10-3.)

16

## C.    Balance of Equities

Plaintiffs argue that the balance of equities tips in their favor because without relief the treatments could proceed without an adequate record of decision, and the environmental injuries outweigh a temporary delay to enjoined treatments. (Doc. 6 at 14.)

Defendants assert that the balance of equities favors treatment because harms to the Iron Mask are certain; implementation is crucial to maintaining land health; restoring species habitat; and reducing wildfire risk compared to Plaintiffs' minimal, general, and abstract harms.  (Doc. 7 at 21.)  Defendants also assert that the relative impermanence of the treatments combines to tip the balance in their favor.  (*Id.*)

Courts are duty-bound to balance the competing claims of injury and consider the effect of granting or withholding relief on each party.  *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co.*, 480 U.S. at 542).  Courts must also pay particular attention to the public consequences of "employing the extraordinary remedy of injunction."  *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Balancing the equities here juxtaposes Plaintiffs' alleged environmental and personal harms with Defendants' duty to maintain and restore land health and habitat.  The Court finds that the balance tips in Plaintiffs' favor.  While BLM's

17

duty to manage the land, including maintaining the area's environmental health, restoring habitat, and reducing wildfire, is important work on behalf of the public, the SEA's apparent shortcomings in analyzing the treatment's cumulative impacts on sensitive species is a heavy weight on the NEPA scale.  BLM cannot proceed without a full analysis as contemplated by NEPA and ordered by the Court in *Iron Mask I*.

Thus, the Court finds that the consequence to the public of employing the remedy of an injunction is justified in that it will hold BLM accountable to NEPA's requirements.

### D.    Public Interest

Plaintiffs argue that preservation of the environment is in the public interest as contemplated by NEPA and implicated when logging and its associated effects on the environment are involved.  (Doc. 6 at 11.)  Plaintiffs also assert that "ensuring government agencies comply with the law is a public interest in the highest order."  (*Id.*, citing *Native Ecosystems Council v. USFS*, 866 F.Supp.2d 1209, 1234 (D. Idaho 2012).)  Plaintiffs argue that when a potentially damaging program proceeds without an adequate record of decision in the absence of preliminary injunctive relief, the public interest favors issuance of an injunction. (*Id.* at 12.)

Defendants argue that enjoining the proposed treatments would harm the public interest because the public benefits from restoring habitat to its historic conditions and improved land health.  (Doc. 7 at 21.)  Defendants assert that the treatments at issue are not the sort of logging operations involved in *Cottrell* and *Connaughton*, but instead focus on the removal of immature trees designed to restore habitat.  (*Id.*)  Further, Defendants argue there is "broad public support" for the treatments.  (*Id.* at 22.)

The Court finds that it is in the public's interest for BLM to fulfill its mandate under NEPA before proceeding further with treatments in the Iron Mask. The likely failure to take a hard look at sensitive wildlife species in the Iron Mask undermines Defendants arguments: BLM could not possibly know whether the vegetation treatments will benefit or harm wildlife when it has not studied cumulative impacts to species it has designated sensitive.  The obvious inference is that sensitive species are sensitive to environmental damage, alteration, or impacts. Without the requisite analysis, the public interest falls squarely on the Plaintiffs' side.

## E.    Bond

Defendants argue that Plaintiffs should post a meaningful bond under Fed. R. Civ. P. 65(c).  (Doc. 7 at 32.)  Plaintiffs argue that it is well established in public interest environmental cases that a bond need not be posted.  (Doc. 10 at 17.)

Plaintiffs also argue that BLM has not shown what costs and damages would be incurred as a result of issuance of a preliminary injunction, and that BLM would not have to pay a contractor if issued.  (*Id.* at 18.)

Rule 65(c) requires that the movant post a security in an amount the court considers proper to pay the costs and damages sustained by a party to have been wrongfully enjoined or restrained.  Fed. R. Civ. P. 65(c).  District Courts are in the best position to determine the amount and appropriateness of the bond under Rule 65 and can dispense with the requirement or require nominal security.  *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).  The purpose of the bond requirement is three-fold: first, discourage a moving party from seeking relief to which it is not entitled; second, to assure that if such relief is errantly granted, the wrongfully enjoined party does not bear the cost of the error; and third, to provide the wrongfully enjoined party a ready source to collect damages.  *Nintendo of Am., Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1037 (9th Cir. 1994); *Continuum Co. v. Incepts, Inc.*, 873 F.2d 801, 803 (5th Cir. 1989), on reconsideration sub nom. *Continuum Co. v. Incepts, Inc.,* 901 F.2d 1111 (5th Cir. 1990).

Here, Plaintiffs aver that the co-plaintiff organizations are small, have limited budget and funds, and posting a bond would constitute a hardship and thereby stifle its ability to challenge Defendant's actions.  (Docs. 10 at 17-18; 10-3

at ¶¶ 9-16.)  Taking this attestation in concert with BLM's acknowledgement that it will "soon undergo contracting," the Court finds that BLM has not established that it will suffer concrete damages upon issuance of an injunction.  (*See* Doc. 7 at 32, citing Doc. 7-2 at ¶ 5.)  Plaintiffs' strong showing of the *Winter* elements further supports this Court's exercise of its discretion by way of requiring no bond be required.

Therefore, the Court recommends no bond be required.

## IV.    Conclusion

In summary, the Court finds that Plaintiffs have satisfied the four *Winter* elements and recommends that a preliminary injunction be issued.  After careful consideration of the parties' arguments and evidence, the Court finds that the SEA has likely failed to satisfy this Court's order in *Iron Mask I* and thus NEPA's requirement that BLM give a hard look to the cumulative impacts of the proposed treatments on wildlife – with particular attention on sensitive species.  Based on the above analysis,

**IT IS RECOMMENDED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 5) be GRANTED and Defendants' request for a security be posted be DENIED.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the

21

parties.  The parties are advised that, pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court, and copies served on opposing counsel, within fourteen (14) days after entry hereof, or objection is waived.

**IT IS ORDERED**.

DATED this 6th day of July, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge